| | | |
|---|---|---|
| **PA REALTY GROUP, LLC, in capacity** | : | |
| **As Successor Agent under those** | : | |
| **Certain 12% Series A Senior Secured** | : | |
| **Convertible Promissory Notes,** | : | **CIVIL CASE NUMBER:** |
| *Plaintiff*, | : | |
| | : | **3:16-cv-00630-VLB** |
| **v.** | : | |
| | : | **September 19, 2017** |
| **H. LEE HORNBECK, in capacity as** | : | |
| **Agent,** | : | |
| *Defendants*. | : | |

<u>**MEMORANDUM OF DECISION ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT [DKT. 33, 39]**</u>

This case involves a dispute over the rightful Agent for the holders (the "Note Holders" or "Series Holders") of the Stratex Oil and Gas Holding, Inc. ("Stratex") 12% Series A Senior Secured Convertible Promissory Note (the "Notes" or "Series A Notes"). Before the Court are the parties' cross-motions for summary judgment. Plaintiff filed a Motion for Partial Summary Judgment requesting the Court rule on Count One of the First Amended Complaint and Count One of Defendant's Counterclaim, which both seek declaratory judgment under 28 U.S.C. § 2201 regarding Defendant's role as Agent to Series A Note Holders. [Dkt. 33 (Pl.'s Mot. Summ. J.) at 1]. Defendant opposes this motion and further submitted a Motion for Summary Judgment seeking "judgment in his favor on the complaint and on his counterclaim." [Dkt. 39-1 (Def.'s Mem. Mot. Summ. J.) at 9]. However, Defendant only addresses the issue of revocation and does not address Plaintiff's Counts Two through Four: unjust enrichment, accounting, and the imposition of a constructive trust. The Court thus construes

his motion as one for partial summary judgment as well. For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's Partial Motion for Summary Judgment.

I. Background

A. The Parties

Stratex is a publicly traded energy company. [Dkt. 33-2 (Pl.'s L. R. 56(a)(1) Stmt.) ¶ 1; Dkt. 37 (Def.'s L. R. 56(a)(2) Stmt.) ¶ 1]. Defendant H. Lee Hornbeck ("Defendant" or "Hornbeck") is an individual holder of Notes in the original principal amount of $105,000 and was appointed in February 2014 as the Agent for the Note Holders. *See* [Dkt. 40 (Def.'s L. R. 56(a)(1) Stmt.) ¶¶ 4, 7, 9; 44-1 (Pl.'s L. R. 56(a)(2) Stmt.) ¶¶ 4, 7, 9]. Plaintiff PA Realty Group, LLC ("Plaintiff" or "PA Realty") is a limited liability company that purchased Notes in the original principal amount of $250,000, and it purports to be the current Agent for the Note Holders after having organized Defendant's removal as Agent. *See* [Dkt. 40 ¶¶ 1, 9-10; Dkt. 44-1 ¶¶ 1, 9-10; 33-3 (Apr. 17, 2016 Letter) at 6 of PDF]. PA Realty is a limited liability company formed on April 13, 2016, under Connecticut law whose sole member is PA Realty Group, LLC ("Pennsylvania LLC"), a limited liability company formed in 2008 under Pennsylvania law. [Dkt. 40 ¶ 2; Dkt. 44-1 ¶ 2]. Yakov Plotnikov is the managing member of the Pennsylvania LLC and the only person authorized to speak on behalf of Plaintiff. [Dkt. 40 ¶ 2; Dkt. 44-1 ¶ 2].

B. Facts

In January 2014, Stratex issued a private placement memorandum ("PPM") summarizing its offer of up to $10 million worth of Units consisting of the Notes

and Series A Warrants convertible into common stock of the Company. [Dkt. 40 ¶ 4; Dkt. 44-1 ¶ 4]. The PPM included a Subscription Agreement containing the statement that by signing the Subscription Agreement each Note Holder represented and warranted that the Unit, including the Notes, are restricted securities and that each "is acquiring the Unit(s) subscribed solely for the Subscriber's own beneficial account, for investment purposes, and not with view to, or for resale in connection with, any distribution of the Units." [Dkt. 10-2 (Mot. TRO Ex. 2, Funk Aff. and Exs.) at 87 of PDF].

The Notes Holders were to complete and submit to Stratex a Subscription Agreement and purchase the Notes. *See generally, id.* at 82-98. The Note submitted into evidence provides that it is "one of a series of duly authorized and issued promissory notes" designated as Series A Notes with an aggregate principal face value up to a maximum amount of $10,000,000. *Id.* at 125 of PDF. Pursuant to the Note, the principal matured two years after the closing on the Minimum ($2,000,000) occurs and that the principal will be paid in one lump-sum payment on the Maturity Date, while the interest rate is 12% per annum to be paid quarterly in arrears.[1] *Id.* 20-21, 125 of PDF. The Note provides that payments made by the Company shall be made to all Note Holders at the same time. *Id.* at 126 of PDF.

Within six months from the Original Issue Date, the Note Holder had "the right, at the Note Holder's option, to convert all or any portion of the Principal Amount hereof and any accrued but unpaid interest thereon into shares of

---

[1] The maturity date is February 11, 2016. *See* [Dkt. 10-3 (Mot. TRO Ex. 2, Plotnikov Decl. and Exs.) at 19 of PDF].

common stock, par value $.01 per share," of Stratex. *Id.* at 127 of PDF. This conversion would in function lead to the reduction of the principal amount and/or accrued interest of the Notes in exchange for certificates of common stock. *Id.* at 127 of PDF. Upon any partial conversion of a Note, Stratex was required to issue a "new promissory note containing the same date and provisions" of the original note "for the principal balance of this Note and interest which shall not have been converted or paid." *Id.* at 128 of PDF. There is no evidence on the record that any Note was converted for Stratex stock.

The Notes were secured by a Security Agreement, under which Stratex pledged a first perfected security interest in its assets to secure payment of the Notes and reiterated many of the pertinent provisions of the Notes. *Id.* at 186, *et. seq.*, of PDF. Stratex was charged in the Note to maintain the Note Register at its principal office in Houston, Texas, reflecting the principal amount of the Notes held by each Note Holder. *Id.* at 137 of PDF. In the Note, Stratex agreed to execute the Security Agreement in favor of the Agent for the benefit of the Note Holders. *Id.* at 125 of PDF.

The Notes appoint and the Security Agreement contemplate the appointment of an Agent expressly and irrevocably authorized to act on behalf of the Note Holders "to act or refrain from acting" on matters designated to the Agent; "[t]o distribute promptly to the Series Holders, if required by the terms of the Notes, all written information, requests, notices, payments, prepayments, documents and other items received from the Company"; and to deliver to Stratex any requests, demands, approvals, notices, or consents of the Note

Holders. *Id.* at 131, 179 of PDF. The Note and the Security Agreement authorizes the Agent to exercise on behalf of each Note Holder "all rights and remedies of the Series Holders upon the occurrence of any Event of Default and/or default specified in this Note or applicable laws." *Id.* at 130 of PDF; *see id.* at 179 (wherein the Security Agreement appoints the Agent "for purposes of exercising any and all rights and remedies of the Secured Parties hereunder"). The Security Agreement identifies Hornbeck as Agent to the Secured Parties (i.e. Series A Note Holders). [Dkt. 40 ¶ 6; Dkt. 44-1 ¶ 6; Dkt. 10-2 at 170 of PDF].

The Security Agreement, by which the Agent must abide,[2] also includes provisions about the methods for terminating the Agent. Under the Appointment of Agent clause, the "appointment shall continue until revoked in writing by a Majority in Interest, at which time a Majority in Interest shall appoint a new Agent." *Id.* "Majority in Interest" is defined as "at any time of determination, the majority in interest (based on then-outstanding principal amounts of Notes at the time of determination) of Secured Parties." *Id.* at 158 of PDF. The Agent may also resign, pursuant to Annex B to the Security Agreement, "at any time by giving 30 days' prior written notice (as provided in the Agreement) to the Company and the Secured Parties." *Id.* at 180 of PDF. "Such resignation shall take effect upon the appointment of a successor Agent" so long as either (1) the Secured Parties appoint a successor agent after notice of resignation, or (2) if a successor

---

[2] The Note requires the Agent "[t]o act . . . for the Series Holders under the collateral documents, including but not limited to any and all security agreements and financing statements." *Id.* at 131 of PDF.

appointment is not made within 30 days "the Agent shall then appoint a successor Agent who shall serve as Agent until such time. . . ." *Id.*

On February 20, 2014, a UCC financing statement was filed listing Hornbeck as a Secured Party. [Dkt. 10-2 at 182 of PDF]. The document does not bear his signature, although there does not appear to be a signature requirement. Plotnikov contends that this filing perfected Hornbeck's security interest. [Dkt. 10-3 at 2 of PDF].

Stratex filed a Form 8-K on April 10, 2014, indicating that as of this date Stratex raised $9,987,650 in gross proceeds "in connection with the private offering of the Notes and Warrants." *Id.* at 127 of PDF; *see* Dkt. 10-2 at 2 of PDF ("In that Offering, Stratex raised $9,987,650"); Dkt. 10-3 at 3 of PDF (wherein Plotnikov declared, "Based on my review of public documents available at the Securities and Exchange Commission, I understand that Stratex raised $9,987,650 from the Note Holders.")]. The Form 8-K states that "all outstanding principal under the Notes is due payable on February 11, 2016." [Dkt. 10-3 at 127 of PDF].

On November 16, 2015, Hornbeck sent Series A Note Holders a letter regarding Stratex's default on Series A and Series B Notes. *See id.* at 80 of PDF. The letter indicates Stratex defaulted on payment of interest and explains the company was in "extremely poor financial position" with "no cash and very few assets of value to repay this note." *Id.* The letter also states that Hornbeck and the Agent for Series B Notes "sent notice of default and demand for payment" in addition to "a notice of the sale of assets if we the agents decide this is the best approach to get payments to the Noteholders." *Id.* Hornbeck notified the Note

Holders that "[i]n order to save these assets, pay existing expenses, legal and accounting fees and determine if it is feasible to try and recover a net $4 to $5 million in the tax loss carryforward and whatever we can from the producing wells the agents are levering a $500 per $100,000 call on all Noteholders." *Id.* "These funds should immediately be sent by wire transfer to the Washburn Law Firm attorney's trust account. . . ." *Id.* at 80-81 of PDF.

On April 17, 2016, Hornbeck received an email from Richard Gora, PA Realty's attorney, notifying him of the following: "YOUR APPOINTMENT AS AGENT OF THE NOTES HAS BEEN REVOKED IN WRITING BY A MAJORITY IN INTEREST OF THE HOLDERS OF THE NOTES. TO BE CLEAR, YOU HAVE BEEN REMOVED AS AGENT, AND YOU NO LONGER HAVE ANY AUTHORITY AS AGENT UNDER THE NOTES." [Dkt. 10-4 (Mot. TRO Ex.4, Gora Decl. and Exs.) at 7 of PDF]. The email does not include a note register or disclose the Note Holders who voted for his termination. The email also demands an accounting of all Stratex assets in his possession, including a Chevy Tahoe under his counsel's name, any funds called from the Note Holders, and documents and communications relating to the Notes and Stratex. *Id.* Plotnikov admits that he was involved with the voting process. [Dkt. 40 ¶ 15; Dkt. 44-1 ¶ 15; Dkt. 40-2 (Def.'s L. R. 56(a)(1) Stmt. Ex. 1, Plotnikov Dep.) at 47-49].

Submitted into evidence are various signed Note Holders' Forms of Vote for Agent Removal, voting for Hornbeck's removal. *See* [Dkt. 10-3 at 85-120 of PDF. These Note Holders have also submitted declarations stating under penalty of perjury that they are Note Holders; that they are holders of a specified principal

balance amount of Notes; that their Form of Vote for Agent Removal is true and accurate and bears their signature; that they intended to remove Hornbeck as Agent; and that they intended to replace him with PA Realty as Successor Agent. *See generally,* [Dkt. 33-4 (Mot. Summ. J. Ex. E, Note Holder Decls.)]. Plaintiff also submitted a chart of Note Holders, their loan amounts, and monthly accrued interest, dated September 30, 2015. *See* [Dkt. 33-3 (Mot. Summ. J. Ex. D.1, Plotnikov Decl. Note Holder Chart)]. Hornbeck attests that, although he was a Note Holder and Secured Party, he did not receive notice of the supposed vote to remove him as Agent. [Dkt. 38 ¶ 11].

The next day, Hornbeck's attorney responded in an email that they would step down after receiving and reviewing "written votes and method of verification." [Dkt. 10-4 at 5 of PDF]. Hornbeck's counsel avers in the email that the Tahoe constitutes a "deal done outside of the scope of our representation." *Id.* On April 20, 2016, PA Realty's attorney sent Hornbeck's attorney an email stating that they would send the Note Holders' votes after Hornbeck and his attorney filed a Non-Disclosure Agreement ("NDA"). *Id.* at 12 of PDF. The NDA refers to Hornbeck and his counsel as "Former Agent" and refers to PA Realty and its counsel as "Successor Agent." *Id.* at 14 of PDF. There is no evidence in the record indicating Hornbeck signed this NDA.

The day after circulating the NDA to Hornbeck on April 21, 2016, PA Realty filed this lawsuit. [Dkt. 1 (Compl.)]. The following day on April 22, 2016, Hornbeck's attorney emailed an attachment documenting Hornbeck's resignation to Jack Munsey, Chief Executive Officer of Hornbeck's retained counsel,

Washburn Law, PLLC; Hornbeck; and counsel to PA Realty, Richard Gora. [Dkt. 10-4 at 23 of PDF]. Hornbeck states, "I am sorry to say, that I no longer have the time, money nor the energy to fight with PA Realty Group LLC, the group trying to wrest control of the group of Series A Noteholders from my oversight. I can state categorically that I have done nothing wrong." *Id.* at 24 of PDF. He also claims that he "did not fail to file a security interest as the Notes specifically assign this duty to Stratex." *Id.* Notably, Hornbeck acknowledges, "I have just learned that the attorneys for Stratex did prepare a UCC that covers very little in the way of assets, in my name and that of Ernest Orlando the Agent for Series B Noteholders which I have no idea why it was filed this way nor did we ever discuss or authorize Stratex's attorney Matthew S. Cohen at Buchanan Ingarsoll & Rooney to file such a UCC." *Id.* In an affidavit filed before this Court Hornbeck attests that he did send "a communication to the Secured Parties on April 22, 2016, announcing that [he] was resigning as agent due to [his] frustration with the machinations of Attorney Gora and/or plaintiff." Dkt. 38 ¶ 12]. However, he claims that he "revoked that resignation shortly after sending it." *Id.* Hornbeck has not filed any evidence that he revoked his resignation.

## II.   <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been

met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) (citing *Gottlieb*, 84 F.3d at 518); *see Martinez v. Conn. State Library*, 817 F.Supp.2d 28, 37 (D. Conn. 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

III.　　**Analysis**

Connecticut law governs the interpretation of the agreements relevant to the parties' dispute. *See* [Dkt. 10-2 at 89, 138, 151 of 186 (establishing the validity, enforcement, interpretation, construction, and effect of the Subscription Agreement, Series A Note, and Warrant are to be controlled by Connecticut law and confirming all parties consent to the exclusive jurisdiction in federal or state courts in Hartford)]. Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7-8 (2011) (quoting *Remillard v. Remillard*, 297 Conn. 345, 355 (2010)); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction." (quotations omitted)).

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe*, 300 Conn. at 260 (quoting *Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734-35 (2005)). A contract is unambiguous when "its language is clear and conveys a definite and precise intent . . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.*

Any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so . . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Harbour Pointe*, 300 Conn. at 261 (quoting *Cantonbury Heights*, 273 Conn. at 735).

The parties do not dispute the interpretation of any contract terms and therefore appear to agree that all terms are clear and unambiguous. Rather, the parties disagree as to the implementation of the contractual provisions surrounding revocation and resignation of the Agent under the Security Agreement.

A. *Declaratory Judgment*

Section 2201 of Title 28 of the United States Code enables the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Such a declaration has "the force and effect of a final judgment or decree." *Id.* The Court has been tasked with determining who is the valid Agent of the Series A Note Holders. The parties each contend that they are the valid Agents. The Court must determine two main issues: (1) whether Hornbeck was properly revoked; and (2) whether Hornbeck effectively resigned.

1. *Revocation*

The first question the Court must answer is: whether the Note Holders had the authority to terminate the Agent. The Note states the Agent is irrevocably empowered to act on behalf of the Note Holders. [Dkt. 10-2 at 130-31 of PDF]. However, the Security Agreement states that the appointment of the Agent "shall continue until revoked in writing by a Majority in Interest, at which time the Majority in Interest shall appoint a new Agent." *Id.* at 170 of PDF. The Note provides for the succession of the Agent upon his resignation, which does not become effective until the Majority in Interest of the Note Holders votes in favor of a successor or the Agent appoints a successor who will serve until the Majority in Interest appoints a Successor Agent. *Id.* at 132-33 of PDF. Indeed, the Note Holder's termination of the Agent appears inconsistent with the irrevocable conveyance of powers to the Agent. That is particularly true under the facts presented where the lead Note Holder sought to remove Hornbeck because he disapproved of the manner in which Hornbeck was enforcing Note Holder rights.

Assuming, *arguendo*, but not ruling whether the Note Holders can terminate the Agent, the second question the court must ask is did a "Majority in Interest" as defined under the Security Agreement properly vote and revoke Hornbeck as Agent? "Majority in Interest" is defined as "at any time of determination, the majority in interest (based on then-outstanding principal amounts of Notes at the time of determination) of Secured Parties." [Dkt. 10-2 at 158 of PDF]. Plotnikov declared that between April 13 and 17 of 2016, he "solicited or caused to be solicited a vote" to remove Hornbeck as Agent. [Dkt. 10-3 at 2 of PDF]. By and through counsel, Plotnikov emailed Hornbeck on April

17, 2016, notifying him that a Majority in Interest of the Note Holders voted to revoke his appointment as Agent. [Dkt. 10-4 at 7 of PDF]. Plaintiff contends the "then-existing principal amount" as of the day of the vote was the same as the gross proceeds raised in the private offering: $9,987,650. *See* [Dkt. 33-1 at 1]; *see also* [Dkt. 10-3 at 127 of 130]. However, Plaintiff has submitted very little, if any, admissible or even relevant evidence supporting the position that a Majority in Interest was properly reached. The Court now discusses the admissibility of supporting evidence.

### i. "Stratex Oil PPM – Accrued Interest" Chart

Plaintiff includes as an exhibit a chart titled "Stratex Oil PPM – Accrued Interest" that lists the loan amounts for each Series A investor. *See* [Dkt. 33-3]. Plaintiff relies on this chart to argue that a Majority in Interest voted to revoke Hornbeck's position as Agent; the chart allegedly shows that the individuals who voted comprised 52.6% of the "then-outstanding principal balance of the Notes" (i.e. $5,255,000 out of $9,987,650, the latter number being Plaintiff's contention of the "then-outstanding principal amount"). *See* [Dkt. 33-2 ¶¶ 9-10].

As an initial matter, this document constitutes hearsay because it is offered for the truth of the matter asserted: that the voting Note Holders held the principal balances specified as loan amounts in the chart. Fed. R. Evid. 801(c)(2). To be admissible, hearsay must fit within one of the hearsay exceptions. *See* Fed. R. Evid. 802. The Court identifies Fed. R. Evid. 803(6), the business records exception, to be the applicable hearsay exception for the chart. Under Fed. R. Evid. 803(6), a document constituting hearsay is nonetheless admissible when a

custodian or otherwise qualified witness testifies or properly certifies that it is (A) "made at or near the time by—or from information transmitted by—someone with knowledge"; (B) "kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; and (C) made as "a regular practice of that activity." Plotnikov submitted a declaration pursuant to 28 U.S.C. § 1746 averring that this chart is "a true and accurate copy" of the list of Series A Note Holders. [Dkt. 33-3 at 1 of PDF]. He did not, however, testify or certify any of the requirements set forth under Fed. R. Evid. 803(6) and therefore did not lay the proper foundation that would render the chart admissible under the business exception rule.[3] Accordingly, the chart constitutes inadmissible hearsay.

Moreover, Plaintiff has not provided the Court with a basis to properly authenticate the chart under Fed. R. Evid. 901, which requires the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The purpose of the authentication requirement is one of relevancy, as Fed. R. Evid. 104(b) requires proof "sufficient to support a finding that the fact does exist." See Fed. R. Evid. 901, 1972 Advisory Committee Notes, Notes to Subdivision (a). One permissible method for properly authenticating a document is through testimony of a witness with knowledge, wherein the witness provides "testimony that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1). The Advisory Committee Notes to Rule

---

[3] In consideration of Plotnikov's declaration, the Court finds that foundation cannot properly be laid for the chart regarding any other Rule 803 hearsay exception.

901(b)(1) explains that this particular method "contemplates a broad spectrum" that includes "testimony of a witness who was present at the signing of a document. . . ." Plotnikov declared the document to be a "true and accurate copy of the list" of Series A Note Holders, but as Defendant rightly argues in his Opposition on the Motion to Dismiss, [Dkt. 36], he does not claim to have been present when the chart was created and he provides no basis for the Court to conclude he has personal knowledge and can verify the "item is what it is claimed to be."[4]

The Court also notes the font is so small that the names of investors or loan amounts pertaining to the Series A Notes are illegible. *See* [Dkt. 33-3]. Even if the chart was admissible, it would be impossible to ascertain the loan amounts listed in the chart.

### ii.    Note Holders' Declarations

Pursuant to 28 U.S.C. § 1746, Plaintiff also submitted declarations from the Note Holders who voted for Hornbeck's removal. [Dkts. 33-4 to 33-22]. An unsworn declaration is admissible evidence under 28 U.S.C. § 1746 when it is "subscribed by [the person], as true under penalty of perjury, and dated, in substantially the following form": "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)." Defendant

---

[4] Plaintiff also contends the chart is identical to a chart in Defendant's production, submitted as Ex. E to Hornbeck's Affidavit, Dkt. 38-6, and titled "Stratex Offering – Investor List – Series A." Defendant argues the content of these charts are not identical, which the Court cannot validate because Plaintiff's chart is illegible in certain key parts.

rightly pointed out deficiencies in some of the declarations, which Plaintiff then corrected by submitting new declarations as exhibits to the Reply brief. The initial declarations each state the following: "I am, or the entity on whose behalf I submit the declaration is, a holder of a 12% Series A Senior Secured Convertible Promissory Notes (the "Note"), bearing a principal balance of [value], issued by Stratex Oil & Gas Holdings, Inc." *See, e.g.,* [Dkt. 33-4 (Pl.'s Mot. Summ. J. Ex. E, Shadrin Decl.) ¶ 2 (acknowledging a principal balance of $90,000 as of February 16, 2017); 33-5 (Pl.'s Mot. Summ. J. Ex. E, Shteynshlyuger Decl.) ¶ 2 (acknowledging a principal balance of $85,000 as of February 14, 2017); Dkt. 33-6 (Pl.'s Mot. Summ. J. Ex. E, Tulbovich Decl.) ¶ 2 (acknowledging a principal balance of $120,000 as of February 13, 2017)]. These initial declarations were executed in February 2017[5], and they do not explicitly state that the principal balance referenced is the same as the balance in April 2014 when the votes were cast.

The Note states that the Maturity Date for the principal balance is February 11, 2016, and that "[t]he Principal Amount outstanding hereunder shall be paid in one lump sum payment of $250,000 on or before February 11, 2016. . . ." [Dkt. 10-3 at 19 of PDF]. In theory, it could be possible for the "then-existing principal amount" to be different on the date of the vote (which is still unknown to the Court) and the date of the offering. However, in practice, the evidence makes clear Stratex defaulted on and did not make the payments required by the Notes.

---

[5] Some declarations did not contain dates. Where this is the case, the Court will assume the declarations were filed in February 2017.

On November 16, 2015, Hornbeck sent a letter to Note Holders explaining that Stratex "has defaulted on the payment of the interest and is in fault" to the Series A Note Holders. [Dkt. 10-3 at 80 of PDF].[6] Hornbeck also stated that the "preliminary information indicates that Stratex is in extremely poor financial position and there is no cash and very few assets of value to repay this note." *Id.* Hornbeck indicated he and the Series B Agent "have sent notice of default and demand for payment as required by the note to Stratex along with a note of the sale of assets if we the agents decide this is the best approach to get payments to the Noteholders." *Id.* Plaintiff later filed a Temporary Restraining Order on May 16, 2016, alleging that Hornbeck intended to file an involuntary bankruptcy petition against Stratex. [Dkt. 10-1 (Mem. on Mot. TRO) at 1]. The record is devoid of any evidence indicating that Stratex paid off any portion of its Note Holders principal balances. Accordingly, the Court finds that the initial principal balance is still outstanding and therefore the principal balance in February 2017 was the same as the principal balance in April 2014 and was the same as the initial gross proceeds.

Given Plaintiff's "then-outstanding principal amount" of $9,987,650 is correct, the declarations submitted by the Note Holders who voted for Hornbeck's removal do not constitute a Majority in Interest. As Defendant points out, the Note Holders' declarations indicate the sum of the principal balance held by all voting Note Holders equals $4,855,000, only 48.6% of $9,987,650. *See* [Dkt. 36 at

---

[6] As interest payments were due quarterly on March 31, June 30, September 30, and December 31, it is likely Stratex defaulted on September 30, 2015. *See* [Dkt. 10-2 at 125 of PDF].

8-9]. Notably, Weizheng Shen on behalf of WGC International Co., Ltd. ("WGC Int'l"), filed a declaration averring to the company's investment of $600,000 in Series A Notes as of February 15, 2017. *See* [Dkt. 33-22 (Pl.'s Mot. Summ. J. Ex. E, WGC Int'l Decl.) at 1]. Shen also submitted a declaration on behalf of himself as an individual investor, averring to a principal balance of $600,000 as of the same date. [Dkt. 33-21 (Pl.'s Mot. Summ. J. Ex. E, Shen Decl.) ¶ 2]. Plaintiff's inadmissible chart referenced above indicates WGC Int'l invested in a loan amount of $1 million and Shen invested in a loan amount that is indiscernible but appears to be greater than $1 million. *See* [Dkt. 33-3]. The discrepancy between the principal balance set forth in the declarations ($4,855,000) and the inadmissible chart ($5,255,000) is pivotal because only the latter constitutes a Majority in Interest. The Court finds that, even assuming a Majority in Interest of the Notes had the authority to vote to remove Hornbeck (which are rights not provided in the Notes and inconsistent with his irrevocable power to act on behalf of the Note Holders), Plaintiff failed to present evidence that a Note Holders with a Majority in Interest voted to revoke his agency.[7]

2. *Resignation*

---

[7] As aforementioned, a conversion would reduce the principal amount and/or accrued interest of the Series A Notes in exchange for certificates of common stock. [Dkt. 10-2 at 127 of PDF]. Stratex would have been required to issue a new note after conversion to reflect the reduced principal balance and/or interest, also altering the outstanding loan amount for that individual. *See id.* at 128 of PDF. It is possible the difference between the above values exists because Shen and WCG Int'l converted principal and/or interest into common stock. However, there is no evidence in the record to indicate this occurred and the Court will not make such an assumption based on inadmissible evidence.

Annex B of the Security Agreement clearly establishes the procedure for proper resignation. First, the Agent must give 30 days *prior* written notice of resignation to the Company and the Secured Parties. [Dkt. 10-3 at 61 of PDF]. Second, upon circulation of written notice the Secured Parties may appoint a Successor Agent. *Id.* If this does not happen within 30 days, the Agent must appoint a successor to serve until the Secured Parties are able to appoint a Successor Agent. *Id.*

On April 22, 2016[8], Hornbeck by and through counsel circulated his written letter of resignation to Munsey, Gora, and himself. [Dkt. 33-3 at 12 of PDF]. Hornbeck admits that he sent this letter to the Secured Parties. [Dkt. 38 ¶ 12]. There is no evidence that he circulated the letter to Stratex, and the letter documents his immediate resignation rather than a 30-day written notice *prior* to his resignation. There is also no evidence that a Successor Agent was chosen after this letter of resignation was issued.

PA Realty's letter from April 17, 2016, documenting Hornbeck's removal and the appointment of PA Realty as Successor Agent, is not a valid appointment of a Successor Agent. The Resignation by the Agent provision of Annex B specifically states, "*Upon any such notice of resignation*, the Secured Parties, acting by a Majority in Interest, shall appoint a successor Agent hereunder." [Dkt. 10-4 at 61 of PDF]. The Successor Agent appointment in the letter was circulated prior to Hornbeck's resignation, not *upon* his notice of resignation, and therefore it does not satisfy the resignation procedure.

---

[8] April 22, 2016, is one day after this case was filed and five days after Hornbeck was notified of the revocation of his Agent status.

Hornbeck attests that he revoked his resignation shortly after sending it, [Dkt. 38 ¶ 12]. Although Hornbeck does not provide documentary evidence supporting this claim, the affidavit is notarized and is therefore admissible as a self-authenticated document under Fed. R. Evid. 902(8) (stating that "[a] document accompanied by a certificate of acknowledgment that is lawfully executed by a notary public or another officer who is authorized to take acknowledgments" is admissible without extrinsic evidence of authenticity). Plaintiff has not challenged his position either. The contract does not specify whether or under what circumstances a resignation may be revoked. Under ordinary contract principals, an offer may be revoked so long as it is revoked before acceptance. *See L. & E. Wertheimer v. Wehle-Hartford Co.*, 126 Conn. 30, 35 (1939); *MD Drilling & Blasting, Inc. v. MLS Constr., LLC*, 93 Conn. App. 451, 455-56 (Conn. App. Ct. 2006) (citing 1 A. Corbin, Contracts (Rev. Ed. 1993) (§ 2.18, p. 215)); *Jaybe Constr. Co. v. Beco, Inc.*, 3 Conn. Cir. Ct. 406, 411 (Conn. App. Ct. 1965). As there is no indication his initial resignation was proper, or even if it was that the Secured Parties accepted the resignation, the Court finds his revocation of resignation was valid.

IV. <u>Conclusion</u>

For the aforementioned reasons, the Defendant's Motion for Summary Judgment is hereby GRANTED and Plaintiff's Motion for Partial Summary Judgment is DENIED. The Court will schedule a telephonic conference to discuss the status of the case and the parties' forthcoming trial schedule deadline.

**IT IS SO ORDERED.**

        **Vanessa L. Bryant**

        **United States District Judge**


**Order dated in Hartford, Connecticut on September 19, 2017.**